# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40432

United States Court of Appeals
Fifth Circuit

**FILED**

January 26, 2016

Lyle W. Cayce
Clerk

PETER WEBER, Individual,

> Plaintiff–Appellant,

versus

PACT XPP TECHNOLOGIES, AG,

> Defendant–Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, WIENER, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Peter Weber appeals a judgment of dismissal, without prejudice, based on *forum non conveniens* ("FNC"). The district court decided that the subject contract contained a valid and enforceable forum selection clause ("FSC") requiring litigation in Germany. Because the FSC is mandatory and enforceable, and no overwhelming public interest requires retention in Texas, we affirm.

I.

This is a complex, multi-forum dispute over compensation between a

No. 15-40432

German company and its former chief executive officer ("CEO"). PACT XPP Technologies, AG ("PACT"), was a technology start-up company in the field of highly parallel processing that, at some time after 2002, morphed into an intellectual-property licensing and enforcement entity. Weber joined PACT's Supervisory Board in 2002, was elected chairman of the board in 2003, and took over as CEO in 2004. The company is incorporated in Germany, but—during the relevant period—its primary business activities were in the United States.

Weber avers that, until 2008, (1) he had served without compensation under various oral agreements providing for payments once the business became profitable; and (2) in 2008 he entered into a written contract that provided for a combination of profit shares and shares in "special proceeds" that the company earned in patent litigation. That compensation agreement, written in German, appears not to have been negotiated or executed in a single location; PACT's agent signed in Munich, Weber in California. The agreement was approved by board resolution but not by the shareholders.

The agreement contains an FSC, the proper English translation of which is in dispute. The contract states, "Soweit gesetzlich zulässig, ist Gerichtsstand und Erfüllungsort der Sitz der PACT AG." Weber urges that this should be translated to read, "To the extent permitted by law, jurisdiction and place of performance shall be the residence of PACT AG." Instead of translating the word "Sitz" as "residence," PACT says, to the contrary, that it should be given what PACT contends is its more natural contextual meaning of "corporate seat"; PACT therefore avers that the clause should be understood to read, "As far as permitted by statute, jurisdiction and place of performance shall be

2

situated at the seat of the PACT AG."[1]

The contents and effect of the compensation agreement came into issue as a result of a successful patent suit by PACT in the Eastern District of Texas. Weber avers that, as a result of his efforts, PACT discovered infringement by a competitor and resolved to file suit. Weber claims further that he vetted law firms, engaged counsel, and supervised the litigation, which resulted in a hefty jury verdict in May 2012 that yielded a judgment in September 2013.

A few months after the verdict, but before judgment was entered, Weber was voted out of office as a board member of PACT. He tried to establish that PACT felt it was bound to pay his fee nonetheless, but PACT never affirmed that understanding, so Weber sued in November 2013, alleging breach of contract, *quantum meruit*, and promissory estoppel and seeking damages and declaratory relief. Two days later, PACT filed the Civil Law equivalent of a declaratory judgment action in Germany, requesting a declaration that, because the compensation agreement had never been ratified by PACT's shareholders, it was invalid under German law, which requires such ratification.

In the U.S. litigation, PACT moved to dismiss on FNC grounds, contending that both the traditional FNC factors and the *Atlantic Marine* FNC doctrine in the context of an FSC[2] dictated that the German courts were the proper forum. That motion relied heavily on the declaration of Anatol Dutta, a German professor of law specializing in private international law. His declaration explains relevant German and European Union ("EU") legal concepts that PACT claims are applicable. The key aspects of the Dutta declaration are

---

[1] Neither party asserts that the distinction between "To the extent permitted by law" and "As far as permitted by statute" is important.

[2] *See Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 580 (2013) (holding that the correct procedural mechanism for enforcement of an FSC specifying a foreign forum is through a motion to dismiss for FNC).

these:

- Germany, as a Civil Law jurisdiction, does not recognize equitable causes of action as such, but there are legal concepts closely analogous to promissory estoppel and *quantum meruit* that can be deployed by litigants in contract disputes.

- German courts would interpret the FSC as providing for mandatory, exclusive jurisdiction in the German courts.

- The validity or enforceability of the FSC would not be affected by the invalidity of the compensation provisions of the contract.

- German choice-of-law principles would dictate application of German substantive law for two reasons: first, because the applicable EU law (the Rome I[3] and Rome II[4] Regulations) treat FSCs as strong evidence of an implicit election of the substantive law of the selected forum; and second, because German law treats place-of-performance clauses as strong evidence of an implicit election of the substantive law of the place of performance.

- The dispute here implicates important issues of German law and public policy relating to the compensation of board members of German corporations.

Weber's response to the FNC motion emphasized the extent of PACT's U.S. operations and the fact that the dispute arose in large part from the proper allocation of a money judgment obtained in a U.S. court. Weber further maintained that the FSC did not mandate German jurisdiction, because (1) PACT's "residence" was in the United States, where its principal business was carried out (and the FSC did not explicitly vest exclusive jurisdiction and venue in Germany), (2) PACT could not simultaneously disclaim its obligation to pay under the contract and assert the validity of the FSC, and (3) the

---

[3] Regulation 864/2007, on the Law Applicable to Non-Contractual Obligations (Rome II), 2007 O.J. (L 199) 40 (EC). *See* Clay H. Kaminsky, *The Rome II Regulation: A Comparative Perspective on Federalizing Choice of Law*, 85 TUL L. REV. 55 (2010) (discussing the Rome I and Rome II Regulations).

[4] Regulation 593/2008, on the Law Applicable to Contractual Obligations (Rome I), 2008 O.J. (L 177) 6 (EC).

traditional FNC factors heavily favored the Eastern District of Texas as the place for litigation. The factor that Weber stressed was the unavailability of equitable remedies under German law.

Along with a reply brief, PACT filed a supplemental declaration by Dutta emphasizing the availability of Civil Law analogies for *quantum meruit* and promissory estoppel claims. The declaration also engaged in a more extended discussion of the meaning of the word "Sitz" under German law; German law was quite clear on its meaning in this context and that German courts would have no doubt that the term referred to PACT's place of incorporation in Germany. Additionally, Dutta noted that the term "Gerichtsstand," used in the FSC and initially translated by all parties as "jurisdiction," is a term of art under German law "that is used for the purpose of selecting the forum to resolve disputes. In English, its meaning would encompass court, jurisdiction, and venue." Finally, Dutta renewed his position that, under German law and general principles of private international law, an FSC is valid and severable regardless of the validity of the substance of the underlying contract.

After the briefing, Weber filed a declaration by Michael Molitoris, his German litigation counsel, who averred that, on his review of the relevant facts and law, Weber likely would have no remedy should the action proceed in Germany under German law. Molitoris explained that the compensation relationship between a member of a corporate board and the company is governed not by German contract law but by German statutory corporate law. Because the contract was never ratified by the shareholders, German corporate law would prohibit enforcement of the compensation arrangement. Because of certain presumptions in German law, Weber could not recover under the German equivalents of *quantum meruit* and promissory estoppel. In summary, Molitoris stated that "if the action is pursued in Germany, Mr. Weber will be most

5

likely unable to seek any redress for the decade of uncompensated services he conferred on PACT XPP."

At the same time, Weber filed a supplemental declaration of his own stating, at some length, that he was unaware of any ratification requirement, did not consult a lawyer, was told by PACT representatives that no ratification was necessary, and was not under the impression, when the contract was signed, that the FSC specified Germany as the place for litigation.

In June 2014—during the pendency of the FNC motion—the German court issued a provisional judgment declaring that the agreement was unenforceable as to compensation for lack of shareholder ratification. In August 2014, the court entered a judgment with a more thorough explanation. The court stated that even though the agreement was unenforceable as to compensation, the FSC nonetheless vested mandatory jurisdiction over all disputes—local and international—arising from the compensation agreement in the German courts. The German judgment was by consent: Weber filed an "acceptance of claim" pleading that admitted the validity of the PACT suit but expressly reserved his right to pursue equitable claims in the U.S. courts or claims for "unjust enrichment" and "management without order" (Civil Law analogues of *quantum meruit*) in the German courts.

The magistrate judge ("MJ") in the litigation here advised that, even though the German court had invalidated the compensation provisions under German corporate law, the FSC was severable, mandatory, and enforceable.[5] Because that clause was not affected by the German corporate-law principle

---

[5] The MJ cited *Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 301 (5th Cir. 1998), for the proposition that FSCs are presumptively valid and severable and that attacks on the validity of the contract as a whole do not affect the validity of the FSC unless the party seeking to avoid enforcement demonstrates specifically that the FSC, as distinguished from the contract as a whole, was invalid or procured through fraud.

No. 15-40432

that shareholders must ratify compensation agreements, the MJ reasoned that Fifth Circuit law dictated its enforcement. The MJ determined further that there were no extraordinary factors to overcome *Atlantic Marine*'s strong presumption in favor of FNC dismissal when there is a valid FSC; the MJ recommended dismissal without prejudice to refiling in Germany. Weber filed objections to the MJ's findings and recommendations. The district court rejected the objections and adopted the findings and recommendations.

We first review the governing legal framework for enforcement of FSCs, then we turn to the substance of this dispute. We review *de novo* the district court's conclusions that the FSC was mandatory and enforceable. We review for abuse of discretion the district court's use of *Atlantic Marine*'s balancing test (explained at length below). Because the district court correctly determined that the clause was mandatory and enforceable and did not abuse its discretion in concluding that the *Atlantic Marine* balancing test favors dismissal without prejudice, we affirm.

II.

The legal framework is drawn primarily from *Atlantic Marine*, which clarified the proper mechanism for enforcing FSCs. That dispute concerned an FSC pointing to a U.S. court; the Court held that the proper mechanism for enforcing such a clause is a motion for transfer of venue under 28 U.S.C. § 1404(a). *Atl. Marine*, 134 S. Ct. at 575, 579. The Court also specified that the proper mechanism to enforce an FSC that calls for litigation in a domestic state court or in a foreign court is through a motion to dismiss on grounds of FNC. *Id.* at 580. The Court further announced the effect that a mandatory and enforceable FSC should have on the § 1404(a) and FNC analyses.[6]

---

[6] Although the Court's analysis of the effects of the FSC was in the context of a

No. 15-40432

For the usual § 1404(a) or FNC motion, the court considers various private- and public-interest factors. The private-interest factors include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Piper Aircraft*, 454 U.S. at 241 n.6. The public-interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* A plaintiff's choice of forum is given "some"—significant but non-determinative—weight. *See Atl. Marine*, 134 S. Ct. at 581 n.6.

The existence of a mandatory, enforceable FSC dramatically alters this analysis. First, the plaintiff's choice of forum "merits no weight"; instead he has the burden of establishing that § 1404(a) transfer or FNC dismissal is unwarranted. *Id.* at 581–82. And second, the court should not consider the private-interest factors: Because the parties have contracted for a specific forum, they "waive the right to challenge their preselected forum as inconvenient . . . ." *Id.* at 582. Instead, the court should consider *only* public-interest factors. *Id.* "Because those factors will rarely defeat a transfer motion, the

---

§ 1404(a) motion, the Court explicitly noted that § 1404(a) is just a codification of the FNC doctrine "for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer." *Atl. Marine*, 134 S. Ct. at 580 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)). The factors that courts consider in evaluating the propriety of a § 1404(a) transfer and an FNC dismissal are substantively identical, and indeed the Court in *Atlantic Marine* cited *Piper Aircraft*—the canonical FNC case—for a list of the various factors to be considered in deciding a § 1404(a) motion. *Id.* at 581 n.6 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981), for a list of private- and public-interest factors to be considered in evaluating § 1404(a) and FNC motions).

practical result is that [FSCs] should control except in unusual cases." *Id.* Cases in which the public-interest factors are sufficiently strong to outweigh a valid FSC "will not be common." *Id.*

The parties dispute—and *Atlantic Marine* does not address—the proper standard of review on appeal of an FNC dismissal when there is an FSC. Weber maintains that the standard is *de novo*, but PACT argues that it is abuse of discretion. Both parties are partially correct: Ordinary FNC dismissals based on the above-described *Piper Aircraft* balancing test are properly reviewed for abuse of discretion,[7] but the Fifth Circuit's pre-*Atlantic Marine* cases on enforcement of FSCs require *de novo* review.[8]

The post-*Atlantic Marine* standard of review for a motion to dismiss on FNC grounds to enforce an FSC is an issue of first impression in this court. Weber's two basic arguments in favor of a straightforward *de novo* review are unavailing. First, he cites pre-*Atlantic Marine* cases such as *Calix-Chacon*. But those were not decided under an FNC rubric—for example, *Calix-Chacon*, 493 F.3d at 509, used the now-discredited Federal Rule of Civil Procedure 12(b)(3) approach[9] to FSC enforcement, and *Mitsui* does not actually say which precise procedural mechanism was utilized for the motion to dismiss.[10]

Second, Weber cites the *de novo* analysis of other circuits, but they do

---

[7] *Piper Aircraft*, 454 U.S. at 257.

[8] *See Calix-Chacon v. Global Int'l Marine, Inc.*, 493 F.3d 507, 510 (5th Cir. 2007); *Mitsui & Co. (USA), Inc. v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997) (per curiam).

[9] *Atlantic Marine*, 134 S. Ct. at 577 ("Atlantic Marine contends that a party may enforce a [FSC] by seeking dismissal of the suit under § 1406(a) and Rule 12(b)(3). We disagree. Section 1406(a) and Rule 12(b)(3) allow dismissal only when venue is 'wrong' or 'improper.' Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about [an FSC].").

[10] *See Mitsui*, 111 F.3d at 34 (saying only that "Euro moved to dismiss on the basis of the [FSC] in the bill of lading").

not support his approach. His reliance on *Claudio-de Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41 (1st Cir. 2014), is inapposite, because the First Circuit continues to use its pre-*Atlantic Marine* Rule 12(b)(6) method of FSC enforcement instead of the Supreme Court's recommended FNC approach. *See id.* at 46, 46 n.3. [11] It is therefore unsurprising that in *Claudio-de Leon* the court applied its usual standard of review for a Rule 12(b)(6) motion.

Weber's citation to *Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014), is similarly unhelpful; that court specifically withheld the question as to what standard of review should apply to FSC enforcement under the new FNC approach in the wake of *Atlantic Marine*. *Id.* at 217. Indeed, *Martinez* notes the same tension in the caselaw that we face here: a general principle in favor of abuse-of-discretion review for ordinary FNC dismissals in apparent conflict with earlier decisions employing *de novo* review of motions to dismiss in FSC cases. *Id.* But the *Martinez* court found that it need not decide the question, because the standard of review did not affect the outcome. *Id.* And Weber's citation to *AAR International, Inc. v. Nimelias Enterprises S.A.*, 250 F.3d 510 (7th Cir. 2001), fails to support his position, because that court states only that the *enforceability of the FSC* gets *de novo* review (with which we agree), without saying anything about the standard for the overall *Atlantic Marine* balanceing test. *Id.* at 527.

PACT's arguments for ordinary abuse-of-discretion review are similarly inapt. It would be unusual to review a district court's construction of a contract, or its determination of the contract's enforceability, for abuse of

---

[11] As *Claudio-de Leon* correctly notes, 775 F.3d at 46 n.3, the *Atlantic Marine* Court expressly declined to determine whether a Rule 12(b)(6) motion is an appropriate mechanism for enforcement of an FSC. The First Circuit apparently has determined that its previous approach therefore remains valid despite *Atlantic Marine*'s exhortations in favor of the FNC analysis.

No. 15-40432

discretion, because we ordinarily review contract interpretations and enforce-ability rulings *de novo*.[12]  There is no reason for the FSC context to be any different.  PACT concedes as much in its brief, agreeing that the district court's construction of the contract should be reviewed *de novo*.

Therefore, we adopt a mixed standard of review for post-*Atlantic Marine* FNC rulings involving FSCs.  We review the district court's interpretation of the FSC and its assessment of that clause's enforceability *de novo*, then we review for abuse of discretion the court's balancing of the private- and public-interest factors.

III.

We first decide, *de novo*, whether the FSC is mandatory or permissive. Our caselaw recognizes a sharp distinction between mandatory and permissive FSCs.[13]  A mandatory FSC affirmatively requires that litigation arising from the contract be carried out in a given forum.  By contrast, a permissive FSC is only a contractual waiver of personal-jurisdiction and venue objections if liti-gation is commenced in the specified forum.  Only mandatory clauses justify transfer or dismissal.  An FSC is mandatory only if it contains clear language specifying that litigation *must* occur in the specified forum—and language merely indicating that the courts of a particular place "shall have jurisdiction" (or similar) is insufficient to make an FSC mandatory.[14]  Weber urges that the clause is permissive, but PACT claims it is mandatory.

---

[12] *E.g.*, *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 609 (5th Cir. 2000).

[13] *E.g.*, *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127–28 (5th Cir. 1994).

[14] *Id.*  (holding that an FSC providing that "[t]he law and courts of Zurich shall be applicable" was permissive rather than mandatory); *see generally K & V Sci. Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494, 500 (10th Cir. 2002) (collecting decisions from several circuits and comparing language that the courts have held mandatory to that which they have held permissive).

No. 15-40432

To decide which of them is correct, we follow a three-step approach. First, we review the record to determine the best possible English-language rendering of the German-language FSC.  Second, we apply Texas choice-of-law rules to determine which substantive law governs the interpretation of the FSC.  Third, we apply that substantive law to the language of the FSC to decide whether it is mandatory or permissive.   We conclude that this FSC is mandatory.

A.

The German-language contract contains an FSC that reads, "Soweit gesetzlich zulässig, ist Gerichtsstand und Erfüllungsort der Sitz der PACT AG." A review of this record suggests that the best available translation of the passage is that "[t]o the extent permitted by law, jurisdiction, venue, courts, and place of performance shall be at the corporate seat of PACT AG."[15]  That translation departs from Weber's proposed rendering in two key respects; both differences are based on Dutta's uncontradicted declarations.

First, Dutta opined that "Sitz" is best understood as "corporate seat." Although Weber's brief repeatedly asserts that the term should be understood to mean "residence," Weber never rebuts Dutta's persuasive explanation of the term-of-art meaning that "Sitz" has in a commercial contract.  More importantly, though, Weber's own German-law expert, Molitoris, agrees with Dutta: Molitoris rendered that portion of the document as "the seat of PACT AG" and explained that a German court would understand the clause to confer exclusive jurisdiction on the Munich courts (PACT's "seat," where it is registered).

Weber makes no real attempt to defend his proposed translation— rendering "Sitz" as "residence," interpreting "residence" as "principal place of

---

[15] It is agreed that PACT's corporate "seat" is in Munich, Germany.

business," then reasoning that PACT's "principal place of business" was "the United States." Instead, Weber relies on *Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955 (5th Cir. 1974), for the proposition that a court faced with two opposing but reasonable interpretations of a contract provision ought to pick the one that operates against the drafter (here, PACT). If *Keaty* applied, Weber would have a reasonable argument that PACT—the drafter—ought not benefit from its own ambiguous drafting.

But *Keaty* is inapposite, because Weber's proposed "residence" rendering is not reasonable. Weber proffers no evidence or rationale to counter Dutta's thorough and persuasive explanation of the term-of-art meaning that "Sitz" bears in a commercial-law context; Weber's contention in favor of the "residence" construction is nothing more than a series of assertions. Therefore, the rule of construction against the drafter cannot determine the matter: That principle is merely a tiebreaker when a contract is susceptible to two equally reasonable interpretations. Here, there is a persuasive, well-supported interpretation—"corporate seat"—and an unsupported interpretation— "residence"—unreasonably unmoored from the commercial-law context in which the term appears.

Our construction of the FSC also renders the German word "Gerichtsstand" to mean not only "jurisdiction" but also "venue" and "courts." That is because there is uncontradicted testimony by Dutta that "Gerichtsstand," translated with proper attention to its specific legal context, would include those meanings. Specifically, Dutta states that "[a] proper understanding of 'Sitz' reads in harmony with the remainder of the compensation agreement. 'Gerichtsstand' is a term of art that is used for the purpose of selecting the forum to resolve disputes. In English, its meaning would encompass court, jurisdiction, and venue." Weber does not contest that analysis, nor does his

expert have anything to say on the subject. By rendering the word in this manner, Dutta's translation best captures the contextual meaning.

## B.

The parties dispute which law to apply in interpreting the FSC. PACT maintains that German law should apply; Weber advances the federal-general-common-law approach that appears to characterize our past FSC jurisprudence. We conclude that we are bound to engage in the ordinary choice-of-law analysis that federal courts sitting in diversity routinely perform under the *Erie-Klaxon* doctrine.[16] Applying Texas choice-of-law rules, German substantive law governs.

A choice-of-law analysis to determine what substantive law should guide this court's interpretation of the FSC is proper under ordinary principles governing diversity litigation. A federal court sitting in diversity applies the forum state's choice-of-law rules to determine which substantive law will apply. *Klaxon*, 313 U.S. at 496–97. Neither this court nor our sister circuits appear to have hewn closely to this principle in interpreting FSCs. The courts have interpreted FSCs according to general common-law contract principles without addressing the precise source of that law.[17] The use of this general-law approach may be because, in this circuit and others, the *enforceability* of an FSC is governed by federal law. *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). But, as several circuits have explicitly recognized, the question of enforceability is analytically distinct from the issue of interpretation: Only after the court has interpreted the contract to determine whether

---

[16] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

[17] *See, e.g.*, *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004); *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127–28 (5th Cir. 1994).

No. 15-40432

it is mandatory or permissive does its enforceability come into play.[18]

As PACT points out, several sister circuits, acknowledging this distinction between interpretation and enforceability, have applied foreign law to determine the meaning of an FSC. As Weber accurately responds, they have typically done so in the context of contracts that contain choice-of-law clauses specifying foreign law in addition to FSCs specifying a foreign forum.[19] But the presence or absence of a specific choice-of-law clause does not alter the core obligation of a federal court, sitting in diversity, to ascertain which body of substantive law to apply by implementing the choice-of-law rules of its home jurisdiction.

Courts may be justified in pretermitting this analysis when neither party contends that any distinctive feature of the relevant substantive law decides the dispute. And indeed, parties' failure to brief choice-of-law analysis or arguments about distinctive features of foreign law seems to have driven many courts to default to general contract principles, even when they recognize that either ordinary choice-of-law rules or a valid choice-of-law clause would, in

---

[18] *See Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384–86 (2d Cir. 2007); *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 430 (10th Cir. 2006).

[19] *See, e.g.*, *Martinez v. Bloomberg LP*, 740 F.3d 211, 220–21 (2d Cir. 2014); *Yavuz*, 465 F.3d at 427. Neither party accurately characterizes the cases it relies on in this regard. PACT says straightforwardly that "Courts interpret the [FSC] in light of the law of the foreign forum." Weber responds that "PACT flagrantly omits the crucial and dispositive fact that this premise can only apply when the contract contains a valid and explicit choice of law provision selecting the law of a foreign forum."

PACT's claim is too simple in that it misses the fact that there is a choice-of-law analysis that the court must perform before it applies (or declines to apply) foreign law. Weber is correct to the extent that the cases on which PACT relies did involve choice-of-law clauses, but Weber misses the mark in suggesting that those cases stand for the inverse proposition that in the absence of a choice-of-law clause courts *must* apply general law. Nothing in those decisions suggests that, when choice of law is important to the outcome despite the absence of a choice-of-law clause in the contract, a court should not engage in an ordinary choice-of-law analysis to decide how to interpret the language of the FSC.

No. 15-40432

principle, dictate application of foreign law.[20]  But that is not the case here, when the choice of law might be determinative (because German courts would uncontroversially find the clause to be mandatory) and the parties vigorously dispute the proper source of law that should apply.  Resolving that dispute, we conclude that the proper method is to apply Texas choice-of-law rules when interpreting an FSC.

This action was brought in a Texas federal court, so under *Klaxon*, Texas choice-of-law rules apply.  Texas follows the Restatement (Second) of Conflict of Laws.  *E.g.*, *Maxus Exploration Co. v. Moran Bros.*, 817 S.W.2d 50, 53 (Tex. 1991).  When the parties did not contract for the application of the law of a particular forum, Section 188 of the Restatement provides for application of the "law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971).  In turn, Section 6 provides that courts should consider factors including

(a) the needs of the interstate and international systems,

---

[20] *See Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 423–24 (7th Cir. 2007) (noting that "[s]implicity argues for determining the . . . meaning of [an FSC] . . . by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears," but nonetheless applying general-law principles to determine the meaning of the FSC because the parties did not contend there were important differences between Illinois law (which governed under choice-of-law principles) and general law); *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 438 (7th Cir. 2012) (noting, in a dispute over an FSC that also specified foreign law, that, where the parties briefed only general common-law arguments about the FSC and did not make any arguments as to distinctive features of the foreign law suggested by the contract, the court would just apply general contract principles rather than engage in an analysis of foreign law); *Phillips*, 494 F.3d at 385–86 ("Without the benefit of briefing by the parties on this issue, we cannot understand why the interpretation of [an FSC] should be singled out for application of any law other than that chosen to govern the interpretation of the contract as a whole . . . .  However, the parties neither objected to the district court's citation to federal precedent in its interpretation of the clause before us, nor construed the clause under English law in their briefs. We will assume from the parties' briefing that they do not rely on any distinctive features of English law and apply general contract law principles and federal precedent to discern the meaning and scope of the [FSC]." (Citation omitted.)).

No. 15-40432

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative inter-
ests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* § 6.  In evaluating those factors, Section 188 directs the court to pay particu-

lar attention to

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of
business of the parties.

"These contacts are to be evaluated according to their relative importance with

respect to the particular issue." *Id.* § 188.  Further, in contracts for rendition

of services, the court should look to the law of the place where the contract

specifies that the services should be rendered.  *Id.* § 196.[21]  When a contract

for services gives a place for performance, "[a]s a rule, that factor alone is

conclusive in determining what state's law is to apply." *DeSantis v. Wackenhut

Corp.*, 793 S.W.2d 670, 679 (Tex. 1990).

The balance of factors favors application of German law.  This is a

German-language contract, governing the compensation of a German-born

businessman by a German company for his service on its supervisory board of

directors, specifying that performance would be in Munich and contemplating

*at least* permissive jurisdiction in the German courts for disputes arising under

---

[21]  *Accord Maxus Exploration*, 817 S.W.2d at 53 ("In the case of a contract for the
rendition of services, section 196 accords the place of performance paramount importance.").

the contract. That the contract calls for performance "at the corporate seat of PACT AG"—which the parties agree is in Munich—likely settles the issue. Such a contractual specification of a place of performance is generally independently conclusive as to what law to apply. *Id.*

Setting the primacy of that factor aside for a moment, the overall balancing test also favors German law. Looking to the Section 188 factors, three seem to tilt strongly in favor of Germany: "place of performance," "location of subject matter," and "the domicil, residence, nationality, place of incorporation and place of business of the parties." The contract calls for performance in Munich. The subject-matter of the contract is Weber's service as a member of the supervisory board, an activity necessarily directed toward the company's German headquarters (where board meetings took place). Though Weber is a U.S. citizen and domiciliary, the other aspects of this factor point strongly to Germany. Weber was born there and is a German-speaking former German citizen, and PACT was incorporated and headquartered in Germany. The "place of contracting" and "place of negotiations" are basically neutral, because we do not have any facts regarding the location of the negotiations, and the contract was signed in two different locations.[22]

The broader § 6 factors also favor use of German law. The first—the needs of the national and international court systems—does not favor either side particularly. But the "relevant policies" factors seem to point strongly to German law: This dispute concerns the internal compensation relations of a German corporation. A contract between a German corporation and a member of its board seems strongly to implicate German policy. Dutta's declaration

---

[22] *See Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 233 (Tex. 2008) (noting that the role of these factors is minimal when the parties negotiated and signed an agreement remotely from two locations).

makes plain that there are important policy issues regarding German corporate law in this suit, so it makes sense to apply German substantive law. The justified-expectations factor is hard to parse in this context:  Although Weber argues that he never anticipated that German law would control the contract, it was a German-language contract governing the internal relations of a German company.  This factor is more or less a wash, but likely the parties anticipated that German law would govern, given the language and subject matter and the fact that the contract contains an FSC pointing to Munich.

The "basic policies underlying the area of law" factors are embodied in Sections 188 and 196, which, as discussed above, favor German law.  The certainty-and-predictability factor does not especially favor one side or the other.  Finally, the factor of "ease in determining the law to be applied" might slightly militate against German law, given that American courts are not familiar therewith, but the record includes a voluminous—and basically unanimous—discussion of the substance of the relevant German law.  In summary, Texas courts would apply German substantive law.

### C.

Because German substantive law applies, the FSC is mandatory.  Dutta (PACT's expert), Molitoris (Weber's expert), and the German court that heard PACT's declaratory-judgment action agree that, under German law, a clause reading as this one does confers exclusive and mandatory jurisdiction in the specified forum.

### IV.

Having concluded that the FSC is mandatory, we must decide whether it is enforceable.  Though Weber says it is not, his position is without merit.

This court, in keeping with Supreme Court precedents, applies a strong

presumption in favor of the enforcement of mandatory FSCs. *Haynsworth*, 121 F.3d at 962–63.

> The presumption of enforceability may be overcome, however, by a clear showing that the clause is 'unreasonable' under the circumstances. Unreasonableness potentially exists where (1) the incorporation of the [FSC] into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the [FSC] would contravene a strong public policy of the forum state.[23]

Arguments that go to the validity of the contract as a whole do not prevent enforcement of an FSC; instead, the party seeking to avoid enforcement must demonstrate that the FSC is invalid rather than merely claim the contract is invalid. *Id.* In effect, the court is to treat the FSC as both severable and presumptively valid.

Weber advances four basic theories of unenforceability. First, he avers that the FSC is unenforceable because it would deny him a remedy. Second, he contends that to the extent the German court ruled that the compensation agreement never became binding on PACT for lack of shareholder ratification, the FSC is inoperative because there was never any contract to begin with. Third, he maintains that PACT is estopped from enforcing the clause because it took the position that it was not bound by the compensation agreement in the German litigation. Fourth, Weber claims that the concept of unclean hands prevents enforcement of the FSC, because PACT defrauded him by refusing to pay on the agreement and thus should not be allowed to benefit from the clause. But those arguments are insufficient to overcome the strong

---

[23] *Haynsworth*, 121 F.3d at 963 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 7 (1972)).

presumption of enforceability.

Weber's suggestion that he would not have any remedy under German law is unpersuasive. There *are* causes of actions available under German law that would allow him to seek relief essentially identical to the relief available under the quasi-contractual, equity claims he advances in the litigation here. Dutta's declarations discuss those analogous actions in some depth. Molitoris, on Weber's behalf, predicted that those claims would not succeed under German law as a consequence of certain corporate-law presumptions governing work done by corporate directors.

But it is the *availability* of a remedy that matters, not predictions of the likelihood of a win on the merits. And the fact that *certain types of remedies* are unavailable in the foreign forum does not change the calculus if there exists a basically fair court system in that forum that would allow the plaintiff to seek *some* relief.[24] For example, in *Piper Aircraft*, 454 U.S. at 255, the Court determined that FNC dismissal in favor of a UK forum was proper even though the plaintiffs would not be able to bring strict-liability and wrongful-death causes of action and were unlikely to receive damages nearly as high as would be likely in the United States.

Weber's second argument is that because the contract never became operative under German corporate law, there is no binding FSC. But that theory misstates both the litigation position that PACT adopted in the German litigation and the actual ruling of the German court. Weber relies on *Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S. Ct. 2847, 2856 (2010), which noted that an arbitration clause could not be invoked in a dispute

---

[24] *See Kempe v. Ocean Drilling & Exploration Co.*, 876 F.2d 1138, 1145–46 (5th Cir. 1989) (ruling that a foreign forum is "inadequate only where it would afford a plaintiff no remedy at all").

as to whether and when the contract itself was formed. Although this court's decisions do treat FSCs and arbitration clauses as basically similar, *Haynsworth*, 121 F.3d at 963, it does not appear that PACT or the German court took the stance that no contract was ever formed.

PACT urged, and the German court ruled, that the FSC was valid and severable from the rest of the agreement, such that it would govern regardless of whether any obligation to pay the success fee was ever created. That makes sense in light of the fact that the German court's reasoning on the contract dispute turned not on contract law but on German corporate law: The reason the agreement was unenforceable as to the compensation arrangement was that it was not in keeping with German regulatory principles relating to the compensation of board members.

Thus, the parties validly contracted for the FSC itself—they just did not comply with regulatory forms as to the compensation provisions because the shareholders never voted in favor of that arrangement. And Weber makes no clear showing that there was fraud, overreaching, or some other invalidating factor in the procurement of the FSC specifically; all of his contentions are directed to the the substance of the contract as a whole rather than to the FSC. Our caselaw requires that level of specificity before we will refuse to enforce an FSC. *Id.* at 962–64.

Third, Weber reasons that PACT is estopped from enforcing the FSC on account of its position that the compensation agreement never became operative. Because PACT argued that, in the German court, it was not bound by the agreement, Weber claims the company cannot now enforce part of the agreement. But it does not appear that PACT ever took the position that Weber has ascribed to it. In the German forum and the district court, PACT advanced identical arguments that the FSC was mandatory and severable, such that it

survived the invalidity of the underlying compensation agreement. Both the German court and the district court so held.

Fourth, Weber makes a general unclean-hands claim: Because PACT acted inequitably by refusing to pay Weber's success fee, it should not be entitled to the equitable ruling of FNC that it seeks. But, as PACT responds, this court quite recently declined to adopt that legal argument.[25] And PACT correctly observes that the cases that Weber cites for the proposition that FNC is not available to a defendant accused of fraud and other inequitable conduct do not really state that proposition.[26] Finally, the unclean-hands notion puts the cart before the horse: It would require this court to reach the merits of the dispute to determine whether to uphold the FNC dismissal. To the contrary, however, the enforceability determination should be made without reference to the underlying merits. *Haynsworth*, 121 F.3d at 964.

Weber's contentions are insufficient to overcome our strong presumption in favor of enforcement of the FSC. It is enforceable.

## V.

Because the FSC is both mandatory and enforceable, the *Atlantic Marine*

---

[25] *See In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 293 (5th Cir.), *cert. denied*, 136 S. Ct. 64 (2015).

[26] The unclean-hands decisions that Weber relies on do not really stand for the proposition that allegations of fraud or other wrongdoing justify denying FNC dismissal on the basis of an otherwise valid and enforceable FSC. The Court in *Koster v. (American) Lumbermens Mutual Casualty Co.*, 330 U.S. 518, 523 (1947), does not appear to address the unclean-hands doctrine and is primarily focused on the peculiarities of shareholders' derivative suits. Although *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004), has some fairly broad language about the general doctrine of unclean hands, the court was not addressing an FNC forum-enforcement motion but, instead, was discussing collateral estoppel. And any potential application of *PenneCom* is defeated by the above-discussed reasoning from *Lloyd's Register* and *Haynsworth*, because the alleged inequitable conduct here is a merits issue that would have to be litigated to conclusion before the court could decide whether to invoke the unclean-hands doctrine in resolving the FNC motion.

private-interest factors strongly favor dismissal without prejudice to refiling in Germany.  The only remaining question is whether this is one of the rare cases in which the public-interest FNC factors favor keeping a case despite the existence of a valid and enforceable FSC.  The district court determined that the public-interest factors did not so greatly outweigh the private-interest factors as to justify retaining the case in the United Stated despite the parties' agreement.  We review that determination for abuse of discretion and find none.

The public-interest factors for FNC include "administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft*, 454 U.S. at 260 n.6 (internal quotations omitted).  And the Court in *Atlantic Marine*, 135 S. Ct. at 582, made certain its view that the public-interest factors would outweigh a valid forum clause only in truly extraordinary cases:  The factors "will rarely defeat a transfer motion," so "the practical result is that [FSCs] should control except in unusual cases."  "Although it is 'conceivable in a particular case' that the district court 'would refuse to transfer a case notwithstanding the counterweight of [an FSC],' such cases will not be common." *Id.* (citation omitted).

This suggests quite a high burden of persuasion on the party seeking to avoid enforcement of the FSC, and Weber has not met it.  His briefing on the public-interest factors consists of two pages of cursory claims supported by only a single case (which is cited only as authority for the existence of the aforementioned factors).  Those two pages advance several variations on the claim

24

that Texas and the United States have an interest in protecting their citizens from abuse by foreign corporations. That, while true, manifestly is not the sort of exceptional circumstance that justifies disregarding the parties' agreement on public-interest-factor grounds. The interests of the United States and the states individually in protecting their own citizens are implicated in *every* case in which a U.S. citizen attempts to resist enforcement of an FSC; Weber's proposed rule would nullify the Supreme Court's clear directive to reserve, for truly exceptional cases, the step of disregarding the parties' agreement that a case should be litigated elsewhere.

Weber's arguments are not sufficient to demonstrate that the district court abused its discretion in its balancing of the public- and private-interest factors under the *Atlantic Marine* analysis. Given the Supreme Court's strong admonitions in favor of dismissal and against retention save for extraordinary matters, the district court was well within the bounds of its considerable discretion in dismissing.

The judgment of dismissal without prejudice is AFFIRMED.