**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-11197

QUICK TECHNOLOGIES, INC.,

Plaintiff-Appellant,

versus

THE SAGE GROUP PLC and,
SAGE US HOLDINGS, INC.

Defendants-Appellees,

QUICK TECHNOLOGIES, INC.,

Plaintiff-Appellant,

versus

SAGE SOFTWARE, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

December 9, 2002

Before DeMOSS, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Quick Technologies, Inc. ("QTI") filed suit against The Sage Group plc ("Sage Group"), Sage U.S. Holdings, Inc. ("Holdings"), and Sage Software, Inc. ("Sage Software") (collectively "Defendants") for trademark infringement and unfair competition. Prior to trial, the district court dismissed QTI's claims against Sage Group for lack of personal jurisdiction. The district court further denied QTI's request to amend the pretrial order to add a corrective advertising claim. Ultimately, QTI prevailed at trial against Holdings and Sage Software on its trademark infringement claims and the district court entered permanent injunctions in QTI's favor.[1] QTI, however, did not prevail on its claim for an accounting of Holdings' and Sage Software's profits. QTI appeals.

FACTUAL AND PROCEDURAL BACKGROUND

QTI was formed in 1992 and initially provided online information about distributors in the promotional products industry (e.g. companies that imprint a business's logo onto coffee mugs, key chains, flashlights, etc.). QTI claims that by 1995, it had expanded its product offerings to include such things as "online databases, online supplier advertising and other databases and business software." QTI began using the mark SAGE INFORMATION SYSTEM in January 1992 and has been using a variety of marks which incorporate or use the word SAGE (e.g. SAGE, SAGE INFORMATION SYSTEM, SAGE-CD, SAGE-ONLINE, and SAGE-CATALOG LIBRARY) continuously since that time.

Sage Group is a public limited company organized under the laws of England and Wales. Sage Group manufactures and sells software for accounting and business management purposes and

_____

[1] In the Fall 2001, in light of the permanent injunctions issued by the district court on May 30, 2001, Sage U.S. Holdings, Inc. changed its name to Best U.S. Holdings, Inc. and Sage Software, Inc. changed its name to Best Software of California, Inc. For purposes of this opinion, we will continue to refer to these two entities as Holdings and Sage Software respectively.

its principal place of business is in England. On October 14, 1988, Sage Group received registration for the mark SAGE in the United Kingdom. Beginning in 1991, Sage Group, acting through Holdings, acquired several American companies that developed and sold accounting and business management software. By 1995, Sage Group began to consider whether the company should adopt an international brand name and ultimately adopted SAGE as such.

On May 17, 1995, QTI filed an application with the United States Patent and Trademark Office ("USPTO") to register the mark SAGE INFORMATION SYSTEM. This mark was published for opposition in 1996, at which time Sage Group claims it first learned of QTI's use of the SAGE INFORMATION SYSTEM mark. Negotiations began between Sage Group and QTI regarding use of the mark. These negotiations eventually broke down and Sage Group filed a Notice of Opposition to QTI's use of the SAGE INFORMATION SYSTEM mark with the USPTO.

On March 25, 1997, Sage Group filed an intent to use application for the mark SAGE with the USPTO. Sage Group claims that it abandoned this application on March 11, 2002.[2] In 1998, Holdings and Sage Software began using the SAGE mark in connection with their respective products. On May 22, 1998, QTI filed a lawsuit against Sage Group and Holdings alleging, among other things, trademark infringement. On April 22, 1999, QTI filed a similar suit against Sage Software and the cases were later consolidated into the instant case. On September 10, 1999, the district court granted a motion by Sage Group to dismiss the claims against it for lack of personal jurisdiction.

---

[2] The Defendants stated in their brief: "That the application was not earlier abandoned . . . was the result of a miscommunication among counsel for Defendants-Appellees."

3

This case was originally set for trial in November 2000. On November 9, 2000, the district court reviewed the parties' joint proposed Pretrial Order. Soon thereafter, the district court sua sponte continued the case until April 2001. In January 2001, QTI retained new trial counsel. On April 2, 2001, QTI served Defendants with a proposed amended Pretrial Order seeking, among other things, to add a damages claim for corrective advertising. On April 11, 2001, the district court rejected QTI's new Proposed Pretrial Order and entered the joint pretrial order previously submitted to the court in November 2000.

The case was tried before a jury. In addition to instructing the jury on the likelihood of confusion issues, the district judge asked that the jury determine whether Holdings' and Sage Software's infringement was done willfully, i.e. "Has QTI proven . . . the Defendants intended to cause confusion, to cause mistake or to deceive?" The jury was further instructed that if it answered "yes" to the question of willful infringement, it was to "[s]tate the damages, if any you award QTI by reason of the profits made by the Defendants from the sale of software products since each Defendant began using SAGE in commerce." The jury returned a verdict for QTI on most of the likelihood of confusion issues but did not find that the Defendants' conduct was willful. Thus, the jury did not award an accounting of profits. The district court entered final judgment on May 30, 2001, stating that "[h]aving considered the verdict and the applicable authorities, the Court determined that permanent injunctive relief should be entered in favor of [QTI], but that no damages should be awarded."

## DISCUSSION

QTI presents the following issues on appeal: (1) whether the district court erred in dismissing against Sage Group for lack of personal jurisdiction, (2) whether the district court abused its

discretion in denying QTI's request to amend the Pretrial Order to add a new damages claim based on a theory of prospective corrective advertising, and (3) whether the district court erred in instructing the jury that QTI must prove that the Defendants' infringement was done willfully before it could award an accounting of profits under Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), and in instructing the jury that willfully means "to do an act voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion."[3]

## I.    Personal Jurisdiction

"The district court's determination of the exercise of personal jurisdiction over a defendant is a question of law subject to de novo review." Mink v. AAAA Dev. Corp., 190 F.3d 333, 335 (5th Cir. 1999). When personal jurisdiction is challenged, the plaintiff "bears the burden of establishing the district court's jurisdiction over the defendant." Id. When the district court rules on a motion to dismiss for lack of personal jurisdiction "without an evidentiary hearing, the plaintiff may bear his burden by presenting a prima facie case that personal jurisdiction is proper." Wilson v. Belin, 20 F.3d 644, 648 (5th Cir. 1994). In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." Thompson v. Chrysler Motor Corp., 755 F.2d 1162, 1165 (5th Cir. 1985).

---

[3] Within QTI's "Conclusion" to its initial brief, QTI summarily asks this Court to reverse and remand the district court's determination denying attorney's fees. However, this argument is not listed in the "Statement of Issues Presented for Appeal," nor addressed in the body of the brief, thus it is deemed waived. See United States v. Thames, 214 F.3d 608, 611 n.3 (5th Cir. 2000); see also FED. R. APP. P. 28(a)(5) & 28(a)(9)(A). QTI's scant references to the attorney's fees issue in its Reply Brief do not overcome the waiver in this case.

QTI contends that it presented a <u>prima facie</u> case for specific jurisdiction under Federal Rule of Civil Procedure 4(k)(2). Rule 4(k)(2) states:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

"Rule 4(k)(2) thus sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." <u>Thompson</u>, 99 F.3d at 720 (emphasis omitted). "The due process required in federal cases governed by Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment." <u>Submersible Sys., Inc. v. Perforadora Central, S.A.</u>, 249 F.3d 413, 420 (5th Cir. 2001). Furthermore, "[s]pecific jurisdiction over a nonresident corporation is appropriate when the corporation has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." <u>Alpine View Co. v. Atlas Copco AB</u>, 205 F.3d 208, 215 (5th Cir. 2000) (internal quotations omitted).

In this case, there is no dispute that QTI's trademark infringement claims arise under federal law and neither side has claimed that Sage Group is subject to the jurisdiction of the courts of any state. Thus, the only issue is whether exercise of jurisdiction is "consistent with the Constitution and laws of the United States." FED. R. CIV. PRO. 4(k)(2). In order to determine whether the exercise of jurisdiction satisfies the Fifth Amendment, we must conduct the "now familiar minimum contacts analysis . . . to determine whether the assertion of personal jurisdiction would offend traditional notions of fair play and substantial justice." <u>Thompson</u>, 99 F.3d at 723 (internal citations omitted).

6

QTI contends that the following contacts with the United States establish grounds for specific jurisdiction over Sage Group: (1) Sage Group filed an opposition to QTI's trademark application with the USPTO in which it asserted its use of the SAGE mark in commerce in the United States, including in its U.S. marketing efforts; (2) Sage Group retained a U.S. attorney to file the opposition and to negotiate with QTI; (3) Sage Group filed an intent-to-use application with the USPTO; (4) Sage Group contacted U.S. companies concerning its international re-branding efforts, including one trip to the U.S. by its Business Development Director; (5) Sage Group operated a web site, www.sage.com, which provided information about Sage Group, as well as links to its U.S. subsidiaries; and (6) Sage Group used the SAGE mark in publications circulated in the U.S. and added the SAGE mark to "product advertisements, boxes and brochures" used by its U.S. subsidiaries.

Sage Group contends that this Court should only consider its filings with the USPTO and its operation of its website in our minimum contacts analysis because those were the only contacts before the district court at the time it ruled on the motion to dismiss for lack of personal jurisdiction. Even considering all of the contacts cited by QTI, personal jurisdiction over Sage Group is inappropriate.

First, QTI's claims do not sufficiently "arise out of or relate to" the contacts indicated by the documents filed with the USPTO to establish specific jurisdiction. The documents filed by Sage Group merely indicate that Sage Group owned various registrations of the mark SAGE in the United Kingdom, it had the intention of using the mark in commerce in the United States, and its subsidiaries were currently using the mark in the United States.[4] Sage Group's filings with the USPTO further

_____

[4] QTI stated in its brief that it "is not seeking to have the activities of Sage Group's U.S. subsidiaries imputed to Sage Group for purposes of establishing jurisdiction under an alter ego theory," and acknowledged that "Sage Group does not directly sell its products in the United States."

7

indicate that it had used the mark SAGE in advertisements placed in publications which circulate in the United States. Generally, advertisements are insufficient to establish personal jurisdiction. See Singletary v. B.R.X., Inc., 828 F.2d 1135, 1136-37 (5th Cir. 1987) (concluding that advertisements did not establish personal jurisdiction where there was no evidence that the "claim arose out of or was related to" the advertisements). Second, Sage Group's operation of a website containing company and product information and links to its U.S. subsidiaries also does not provide sufficient grounds for the exercise of personal jurisdiction. See Mink, 190 F.3d at 337 (finding that a website that is nothing more than a "passive advertisement," i.e. a website that provides product information, toll-free telephone numbers, e-mail addresses, mail addresses, and mail-in order forms, does not support the exercise of personal jurisdiction). Finally, Sage Group's various contacts with U.S. companies, including those related to its re-branding efforts with its U.S. subsidiaries, also do not involve Sage Group using QTI's mark in commerce in the U.S., thus they do not form a sufficient basis for specific personal jurisdiction.

For the foregoing reasons, we affirm the district court's grant of Sage Group's motion to dismiss for lack of personal jurisdiction.

II.     Amendment to Pretrial Order

The district court's decision not to allow QTI's proposed amendment of the Pretrial Order submitted shortly before trial is reviewed for an abuse of discretion. Masinter v. Tenneco Oil Co., 929 F.2d 191, 194 (5th Cir. 1991). "Because of the importance of the pre-trial order in achieving efficacy and expeditiousness upon trial in the district court, appellate courts are hesitant to interfere with the court's discretion in creating, enforcing, and modifying such orders." Flannery v. Carroll,

8

676 F.2d 126, 129 (5th Cir. 1982). Federal Rule of Civil Procedure 16(e) states that "[t]he order following a final pretrial conference shall be modified only to prevent manifest injustice."

QTI asserts that a damages claim based on prospective corrective advertising was mistakenly left out of the Joint Pretrial Order presented to the district court in November 2000.[5] The district court, concerned with "fundamental fairness," refused to allow QTI to modify the Pretrial Order. QTI argues that the district court abused its discretion because Holdings and Sage Software would not have been prejudiced by the amendment, rather, the amendment would have caused only a slight inconvenience. Moreover, QTI argues that it was substantially harmed by not being allowed to amend the Pretrial Order. We disagree. In Trinity Carton Co. v. Falstaff Brewing Corp., this Court explained that:

> Even though amendment of the Pretrial Order may be allowed where no surprise or prejudice to the opposing part y results, where . . . the evidence and the issue were known at the time of the original pretrial conference, amendments may generally be refused. Each party has an affirmative duty to allege at the pretrial conference all factual and legal bases upon which the party wishes to litigate the case. Failure to do so may implicate waiver of the issue at the discretion of the trial court, subject to considerations of fairness and efficient administration of justice.

767 F.2d 184, 193 n.13 (5th Cir. 1985) (citation omitted). Accordingly, we find that the district court did not abuse its discretion in refusing to allow the amendment.

III. Accounting of Profits

---

[5] QTI correctly points out that the original Joint Pretrial Order presented to the district court in November 2000 was not signed and entered by Judge Lynn at that time. On April 11, 2001, Judge Lynn entered the Pretrial Order presented to her in November 2000 and explained that it was not entered at the November pretrial conference "merely because it's not custom to enter these if the case is not going to go to trial. But I reviewed it at the time, approved it at the pretrial before." "It is a well-settled rule that a joint pretrial order signed by both parties supercedes all pleadings and governs the issues and evidence to be presented at trial." Kona Tech Corp v. S. Pac. Transp. Co., 225 F.3d 595, 604 (5th Cir. 2000) (quoting McGehee v. Certainteed Corp., 101 F.3d 1078, 1080 (5th Cir. 1996)).

9

QTI sought to receive an accounting of Holdings' and Sage Software's profits pursuant to 15 U.S.C. § 1117(a), in addition to injunctive relief pursuant to 15 U.S.C. § 1116.  Section 1117(a) provides that:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 43(a), (c), or (d) [15 U.S.C. § 1125(a), (c), or (d)], or a willful violation under section 43(c) [15 U.S.C. § 1125(c)], shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of section 29 and 32 [15 U.S.C. §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.  Such sum in either of the above circumstances shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party.

As this Court has previously stated, "[t]he goal behind §§ 1116 and 1117 remedies is to achieve equity between or among the parties."  Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 358, 369 (5th Cir. 2000).  "A district court's ruling regarding §§ 1116 and 1117 remedies is subject to an abuse of discretion standard of review."  Id.  The district court's instructions to the jury are also subject to an abuse of discretion standard of review.  See Waco Int'l Inc. v. KHK Scaffolding Houston Inc., 278 F.3d 523, 528 (5th Cir. 2002).  "Although we afford broad discretion in fashioning jury instructions, the trial court must nevertheless instruct the jurors, fully and correctly, on the applicable law of the case. . . ."  EEOC v. Manville Sales Corp., 27 F.3d 1089, 1096 (5th Cir. 1994) (internal citations omitted).

10

Section 1117(a) provides that "the Court shall assess such profits and damages or cause the same to be assessed under its direction." In this case, in addition to instructing the jury on the likelihood of confusion issues, the district judge asked the jury to decide whether Holdings' and Sage Software's infringement was done willfully.[6] The jury was further instructed that if it answered affirmatively regarding the willful infringement issue, it was then to determine the amount of damages, if any.[7]

QTI argues that the district judge erred by conditioning an award of profits upon a finding of a particular mens rea, i.e. willful infringement. QTI contends, among other things, that a willfulness requirement is contrary to the plain language of § 1117(a) and goes beyond the requirements of this

---

[6] The jury charge entitled "willful infringement" stated as follows:

QTI claims that the Defendants willfully infringed its trademark rights. "Willfully" means to do an act voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion.

If you answered Questions No. 1 or 2 [the likelihood of confusion questions] "Yes" as to one or both Defendants, then answer the following question as to that Defendant. Otherwise, do not answer the following Question.

Question No. 3:
Has QTI proven that in connection with the use of the name SAGE in the United States the Defendants intended to cause confusion, to cause mistake or to deceive?

[7] The jury charge entitled "damages" stated, in relevant part:

If you have found that Defendants' infringement, if any, was willful, you may award QTI the profits earned by the Defendants from the infringing activity. . . .

If you answered Question No. 3 "Yes" as to one or both of the Defendants, then answer the following question as to each such Defendant. Otherwise do not answer the following Question.

Question No. 4:
State the damages, if any, you award QTI by reason of the profits made by the Defendants from the sale of software products since each Defendant began using SAGE in commerce.

11

Court's precedent. In contrast, the Defendants urge this Court to explicitly hold that willful infringement is a prerequisite to an accounting of profits under § 1117(a). Alternatively, the Defendants argue that the district court exercised its discretion appropriately when it ruled in the Final Judgment that QTI was not entitled to an award of profits.

In considering these arguments, we are cognizant that several of our sister circuits have embraced a willfulness requirement in order to obtain an award of profits. See SecuraComm Consulting Inc. v. Securacom Inc., 166 F.3d 182, 190 (3d Cir. 1999) (holding that "a plaintiff must prove that an infringer acted willfully before the infringer's profits are recoverable"); Bishop v. Equinox Int'l Corp., 154 F.3d 1220, 1223 (10th Cir. 1998) (finding that "an award of profits requires a showing that defendant's actions were willful or in bad faith"); Minnesota Pet Breeders, Inc. v. Schell & Kempeter, Inc., 41 F.3d 1242, 1247 (8th Cir. 1994) (stating that an accounting of profits may be awarded based on various theories "[i]f a registered owner proves willful, deliberate infringement or deception"); The George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1534 (2d Cir. 1992) (holding that "in order to justify an award of profits, a plaintiff must establish that the defendant engaged in willful deception"); ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 928 (D.C. Cir. 1990) (concluding that "an award based on a defendant's profits requires proof that the defendant acted willfully or in bad faith"). But see Adray v. Adry-Mart, Inc., 76 F.3d 984, 991 (9th Cir. 1995) (concluding that "[a]n instruction that willful infringement is a prerequisite to an award of defendant's profits may be error in some circumstances (as when plaintiff seeks the defendant's profits as a measure of his own damage)"); Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 941 (7th Cir. 1989) (explaining that "[o]ther than general equitable considerations, there is no express requirement . . . that the infringer willfully infringe . . . to justify an award of profits"); Burger

12

King Corp v. Mason, 855 F.2d 779, 783 (11th Cir. 1988) ("Nor is an award of profits based on either unjust enrichment or deterrence dependent upon a higher showing of culpability on the part of the defendant, who is purposely using the trademark.").[8] It is important to note, however, that prior to the amendment of § 1117(a) on August 5, 1999, there were no references to the term "willful" in § 1117(a), thus the decisions of our sister circuits are of limited utility to the decision we are faced with today. See Trademark Amendments Act of 1999, Pub. L. No. 106-43, 113 Stat. 219 (1999) (substituting "a violation under section 43(a), or a willful violation under section 43(c)," for "or a violation under section 43(a)").

Several of our previous cases are instructive. In Maltina Corp. v. Bottling Co., this Court held that an accounting of profits may be proper "even if the defendant and plaintiff are not in direct competition, and the defendants' infringement has not diverted sales from the plaintiff." 613 F.2d 582, 585 (5th Cir. 1980). The Court concluded that an accounting of the profits the defendant earned from its willful infringement was proper and serves two purposes - "remedying unjust enrichment and deterring future infringement." Id.

In Hard Rock Café International v. Texas Pig Stands, Inc., this Court affirmed a district court's denial of an award of profits notwithstanding a jury finding that Hard Rock Café's infringement was willful and that it was unjustly enriched by its infringement. 951 F.2d 684, 687, 689 (5th Cir. 1992). The Court approvingly cited the district court's description of the situation: "While the Court believes defendant sold pig sandwiches knowing of plaintiff's mark, it appears this was

---

[8] For a comprehensive discussion of the viability of a willfulness requirement to an accounting of profits under § 1117(a), see Danielle Conway-Jones, Remedying Trademark Infringement: The Role of Bad Faith in Awarding an Accounting of Defendant's Profits, 42 SANTA CLARA L. REV. 863 (2002).

done not as an attempt to profit from the mark but rather in simple disregard of plaintiff's rights." Id. at 695. This Court concluded that awarding Texas Pig Stands any of Hard Rock Café's profits from the sale of pig sandwiches would be a windfall because there was no evidence that the profits were attributable to Hard Rock Café's infringement. Id. at 696.

In Pebble Beach Co. v. Tour 18 Ltd., this Court adopted a factor based approach to the determination of whether an award of profits is appropriate in trademark infringement cases. 155 F.3d 526 (5th Cir. 1998). The factors to be considered include, but are not limited to "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." Id. at 554; see also Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 823 (5th Cir. 1998) (citing the Pebble Beach factors). Ultimately, this Court concluded that the district court in Pebble Beach Co. did not abuse its discretion in denying an accounting of profits. The Court reasoned that because of the "lack of actual damages and the lack of an intent to confuse or deceive," injunctive relief satisfied the equities of the case. Pebble Beach Co., 155 F.3d at 555.

More recently, this Court once again outlined its factor based approach in Seatrax, Inc. v. Sonbeck International, Inc., 200 F.3d 358, 369 (5th Cir. 2000). With regard to remedies, the Court noted that "[b]ecause each case presents a different set of facts and circumstances, a case-by-case evaluation is warranted to determine the nature of the infringing conduct and its adverse effects, if any, on the plaintiff." Id. In Seatrax, the Court rejected the plaintiff's contention that an accounting of profits was appropriate because the defendant was unjustly enriched, explaining that "evidence of unjust enrichment and diversion of sales [was] speculative at best." Id. at 372. Moreover, the Court

14

found that other factors weighed against an accounting of profits, i.e. the jury did not find that the infringement was willful, the case did not involve palming off, and the permanent injunction would provide "an effective deterrent to future infringement." Id. Thus, the Court concluded that the district court did not abuse its discretion in denying profits.

It is obvious from our cases that willful infringement is an important factor which must be considered when determining whether an accounting of profits is appropriate.[9] In accordance with our previous decisions, and in light of the plain language of § 1117(a), however, we decline to adopt a bright-line rule in which a showing of willful infringement is a prerequisite to an accounting of profits. Rather, we reaffirm the factor-based approach outlined in Pebble Beach Co., Rolex Watch USA, Inc., and Seatrax, Inc.

Section 1117(a) remedies are awarded "subject to the principles of equity." Thus, an award of the defendant's profits is not automatic. See Champion Spark Plug Co. v. Danders, 331 U.S. 125, 131 (1947); Pebble Beach Co., 155 F.3d at 554. In order to determine whether an accounting is appropriate, the court, or the jury in this case, considers the factors outlined in Pebble Beach Co. "Once an award is found to be appropriate, a markholder is only entitled to those profits attributable to the unlawful use of its mark." Id. (citing Texas Pig Stands, Inc., 951 F.2d at 696).

In this case, the district judge instructed the jury that it should not reach the issue of awarding profits unless it determined there was willful infringement. Under this instruction, the jury was only

---

[9] QTI argues that the district court erred by instructing the jury that an infringing act is done willfully if it is done "voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion" and with the intent to "cause confusion, to cause mistake or to deceive." We disagree. See Pebble Beach Co., 155 F.3d at 554 (describing the willfulness factor as "whether the defendant had the intent to confuse or deceive"); see also Tamko Roofing Products, Inc. v. Ideal Roofing Co., 282 F.3d 23, 36 n.10 (1st Cir. 2002) ("As to the meaning of willfulness, the jury was instructed that 'an act is done willfully if done voluntarily and intentionally.'").

afforded the opportunity to consider one factor, albeit an important one. If the other factors are applicable to the case, such a limited instruction is improper.

QTI asserts that only two of the Pebble Beach Co. factors are applicable to the facts of this case - unreasonable delay by the plaintiff in asserting his rights and the public interest in making the misconduct unprofitable. The Defendants do not allege any unreasonable delay by QTI in asserting its rights. Because the jury was instructed that an award of profits was contingent on a finding of willful infringement, and because the jury was not allowed to consider the public interest in making the misconduct unprofitable in its damages determination, we conclude that the jury instruction constitutes error. However, because the statute is heavily imbued with equitable considerations, an error in the jury instruction does not end the analysis. When the evidence as a whole is measured against the only two Pebble Beach Co. factors that are arguably applicable, the principles of equity still do not weigh in favor of an award of profits to QTI. Notwithstanding the error in the jury instruction which limited the jury to considering only wilfulness, QTI has not shown that the district court abused the wide discretion afforded it by the statute in denying an award of profits.

As we have previously held, "a markholder is only entitled to those profits attributable to the unlawful use of its mark." Id. (citing Texas Pig Stands, Inc., 951 F.2d at 696). In Texas Pig Stands, Inc., we concluded that there was no evidence whatsoever that Hard Rock Café used Texas Pig Stands' good will to sell its pig sandwiches. 951 F.2d at 696. As the trial court in Texas Pig Stands, Inc. summarized the situation, "Hard Rock would have sold just as many pig sandwiches by any other name and . . . there is no basis for inferring that any of the profits received by [Hard Rock] from the sale of pig sandwiches are attributable to infringement." Id. (internal quotations omitted). The defendant in Texas Pig Stands, Inc. "sold pig sandwiches knowing of plaintiff's mark, [but] it appears

16

this was done not as an attempt to profit from the mark but rather in simple disregard of plaintiff's rights." Id. at 695. We believe this case poses a similar situation. Thus, as in Texas Pig Stands, Inc., "[t]he granted permanent injunction adequately remedies the complained-of infringement, and awarding [the plaintiff] any of [the defendant's] profits would be far from equitable - it would be a windfall." Id. at 696. Section 1117(a) affords wide discretion to the district court to apply principles of equity when a claim for profits is made. Having considered the record as a whole, we find no abuse of discretion by the district court when it declined to award profits to QTI in the judgment entered on May 30, 2001.

## CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgments.

AFFIRMED.