# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 10, 2020

Lyle W. Cayce
Clerk

No. 18-20449

FINTECH FUND, F.L.P.,

       Plaintiff–Appellant Cross-Appellee,

v.

RALPH HORNE,

       Defendant–Appellee Cross-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-1125

Before OWEN, Chief Judge, and JONES and STEWART, Circuit Judges.

PRISCILLA R. OWEN, Chief Judge:*

Fintech Fund, F.L.P. appeals the district court's forum non conveniens dismissal of this case. Ralph Horne cross-appeals, asserting that the district court did not have personal jurisdiction over him. Because the district court properly exercised jurisdiction over Horne, and the parties agreed to pursue these claims in the United Kingdom, we affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-20449

# I

Plaintiff Fintech Fund, F.L.P. is a Texas limited partnership that licenses biometric verification technology. Fintech's principal place of business is in Sugar Land, Texas. Prior to this suit, Fintech licensed that technology to its U.K. affiliate, CrossVerify Ltd. Defendant Ralph Horne, a U.K. citizen, was the former CEO of CrossVerify.

According to Fintech, Horne failed to deliver as CrossVerify's CEO. Fintech alleges that immediately prior to becoming CEO, Horne met with several individuals interested in starting a new company that would utilize the trade secrets that Horne learned through his employment with CrossVerify. Then, about six months after that meeting, Horne allegedly "deceived Fintech into giving him access to Fintech's servers by stating that he needed to perform a security audit of the servers." Horne contacted Fintech through calls and emails to Marcus Andrade, a limited partner of Fintech responsible for its management. Fintech alleges those calls and emails were fraudulent because no security was needed. After Andrade gave Horne access to Fintech's server, Horne and his associates allegedly downloaded "highly confidential and proprietary information belonging to Fintech." Fintech terminated the license with CrossVerify, and, approximately two weeks later, Horne resigned as CEO of CrossVerify.

The day after Horne resigned, Fintech sued him in federal district court in Houston, Texas. Fintech sued under the Computer Fraud and Abuse Act[1] (CFAA) and the Defend Trade Secrets Act[2] (DTSA), alleging that Horne, or someone acting in concert with him, accessed Fintech's servers based in the United States and downloaded confidential information.

---

[1] 18 U.S.C. § 1030(g).

[2] 18 U.S.C. § 1836(b)(1).

2

No. 18-20449

As a part of his employment, Horne signed a "Non-Disclosure, Confidentiality, Inventions, and Non-Solicitation Agreement" (the Agreement). The Agreement contained three provisions related to where suits between the parties should be brought. First, Section 12(A) contained an arbitration clause:

> 12.   Arbitration and Dispute Resolution
>
> A.   Except for any claims against [Fintech], all disputes, controversies or claims arising out of or relating to this Agreement (including for any breach, invalidity or interpretation of this Agreement), any non-contractual obligations arising out of or in connection with this Agreement, the relationship between Horne and [CrossVerify], services performed for or on behalf of [CrossVerify], shall be finally adjudicated by arbitration under the London Court of International Arbitration ("LCIA") Rules in force at the date of this Agreement, which are deemed to be incorporated by reference into this section 12A, subject to other provisions of this section 12A. . . . For the avoidance of doubt, the arbitration agreement in this section 12A is governed by English law. The parties intend the arbitration to be expedited.

Second, Section 12(D) contained a fallback provision in case the arbitration clause was invalidated:

> 12.   Arbitration and Dispute Resolution
>
> . . . .
>
> D.   If the provisions for arbitration in this Agreement are for any reason invalidated or deemed unenforceable the parties agree to submit to the exclusive jurisdiction and venue of the federal courts located in Houston, Texas, USA, for any legal suit, action or proceeding arising out of or based upon this Agreement, the breach of this Agreement, or any other aspect of the parties' relationship, including claims against [CrossVerify] or [Fintech] and/or their or against their affiliates (including DTN and NAC) and their affiliates, subsidiaries, shareholders, officers, directors, supervisors, managers, employees, agents, consultants, or attorneys, in their capacity as such or otherwise may have against Horne. Further, the parties expressly agree that this forum selection clause is mandatory and not permissive, and the parties

3

No. 18-20449

agree not to object to adjudication in Houston, Texas on grounds of forum non-conveniens.

Third, Section 14 contained a choice of law and forum-selection clause:

14.    Choice of Law; Jurisdiction and Venue. Except as to claims against [Fintech], this Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formulation (including non-contractual disputes or claims) shall be governed and construed in accordance with the laws of England and Wales. Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims), except as to claims against [Fintech].

Based, in part, on those provisions, Horne moved to dismiss the case for lack of personal jurisdiction, lack of subject matter jurisdiction, and improper venue. The district court determined that it had personal jurisdiction and subject matter jurisdiction over Fintech's claims.[3] The district court also concluded that the Southern District of Texas was a proper venue.[4] However, the court sua sponte determined that the case should be dismissed under forum non conveniens.[5] Fintech appeals the district court's forum non conveniens dismissal. Horne cross-appeals, arguing that if forum non conveniens was inappropriate, this court should still dismiss the case for lack of personal jurisdiction.

## II

We first address whether the district court properly exercised personal jurisdiction over Horne. "Whether the district court can properly exercise personal jurisdiction over the defendant is an issue of law we review *de novo*."[6]

---

[3] *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1021-23 (S.D. Tex. 2018).

[4] *Id.* at 1026.

[5] *Id.* at 1028.

[6] *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010) (citing *Felch v. Tranportes Lar–Mex SA DE CV*, 92 F.3d 320, 324 (5th Cir. 1996)).

4

No. 18-20449

"If, as here, the court rules on personal jurisdiction without conducting an evidentiary hearing, the plaintiff bears the burden of establishing only a *prima facie* case of personal jurisdiction."[7]   In evaluating whether the plaintiff has met that burden, "the court must accept as true all uncontroverted allegations in the complaint and must resolve any factual disputes in favor of the plaintiff."[8]

Because the Texas long-arm statute extends as far as constitutional due process permits, we need only consider if the exercise of jurisdiction comports with the Due Process Clause.[9]  "Where the plaintiff alleges specific jurisdiction, as here, due process requires (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable."[10]  "Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant" to make a "compelling case"[11] that "the assertion of jurisdiction is unfair and unreasonable."[12]  Horne argues that Fintech did not meet its burden of showing minimum contacts by Horne purposefully directed at the forum state, and that even if Fintech met its burden, exercising personal jurisdiction would not be fair or reasonable.

Fintech alleges that Horne made fraudulent statements in phone calls and sent emails to Andrade fraudulently indicating that a security audit was

---

[7] *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018) (citing *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343 (5th Cir. 2002)).

[8] *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 496 (5th Cir. 2012).

[9] *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (citing *Moncrief Oil Int'l v. OAO Gazprom*, 481 F.3d 309, 311 n.1 (5th Cir. 2007)).

[10] *Constenla*, 669 F.3d at 498.

[11] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

[12] *Sangha*, 882 F.3d at 102 (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

needed when it actually was not.  At the time Andrade received the calls and emails, he was in Sugar Land, Texas.  The district court held that those phone calls and emails constituted sufficient minimum contacts to satisfy due process concerns.[13]  Horne argues that the phone calls and emails are insufficient contacts because Horne was not aware that Andrade was in Texas when he made the calls and sent the emails.  The district court was not persuaded by Horne's argument and held that because "Andrade is [Fintech's] representative," Horne's contacts were "directed toward [Fintech]," a Texas company.[14]  As the district court pointed out, Horne knew Fintech is a Texas company.[15]  Further, the district court noted that at least one email that Horne sent to Andrade was sent to "fintechfund@crossverify.global," further illustrating that Horne was purposefully contacting Fintech.[16]

We agree with the district court's analysis.  That Andrade was in Texas when Horne called and emailed him may have been fortuitous, "but the tortious nature of the directed activity constitutes purposeful availment," satisfying the minimum contacts requirement.[17]  Horne purposefully called and emailed Andrade.  Those are his tortious contacts with the forum.  Horne quotes *Revell v. Lidov* for the proposition that he "must be chargeable with knowledge of the forum at which his conduct is directed."[18]  *Revell* is distinguishable.  *Revell* involved an allegedly libelous publication that criticized the plaintiff.[19]  The plaintiff sued in Texas, arguing that he suffered the effects of that publication there.[20]  We noted that the only connection the

---

[13] *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1019-21 (S.D. Tex. 2018).
[14] *Id.* at 1019-20.
[15] *Id.* at 1020.
[16] *Id.*
[17] *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999).
[18] 317 F.3d 467, 475 (5th Cir. 2002).
[19] *Id.* at 469.
[20] *Id.* at 471-73.

case had with Texas was that the plaintiff resided there, which the defendant did not know.[21] The publication "contain[ed] no reference to Texas, nor [did] it refer to the Texas activities of [plaintiff], and it was not directed at Texas readers."[22] We held that the defendant did not direct any action at Texas.[23] Here, Horne directed his allegedly tortious conduct at Texas, and he directed it at a Texas entity that he knew was a Texas entity. Those facts are determinative. Accordingly, Horne had sufficient minimum contacts with Texas to satisfy the exercise of specific jurisdiction.

Furthermore, we agree with the district court that the exercise of jurisdiction is fair and reasonable. The court must balance the following factors when determining whether the exercise of jurisdiction is fair and reasonable:

> (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies.[24]

Horne bears the burden of making a "compelling case" that the assertion of jurisdiction is unfair and unreasonable.[25] "It is rare to say the assertion is unfair after minimum contacts have been shown."[26] Most often, "the interests

---

[21] *Id.* at 475-76.

[22] *Id.* at 473.

[23] *Id.* at 475-76.

[24] *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

[25] *Id.* (quoting *Burger King*, 471 U.S. at 477) (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)).

[26] *Wien Air Alaska*, 195 F.3d at 215 (citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1549 (Fed. Cir. 1995)).

of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."[27]

Horne argues that exercising jurisdiction here is unfair and unreasonable primarily because he resides in the U.K. and because the parties agreed to arbitrate their disputes under English law. Horne, however, does not meet his burden. To be sure, he would have a significant burden defending a suit in Texas, but, as the district court noted, Fintech would be equally burdened by litigating in the U.K.[28] The record indicates that Horne has travelled to Texas to conduct business, which, at least to some degree, indicates that the burden of traveling to Texas is manageable. Further, Texas has an interest in the case as the case involves the alleged misappropriation of trade secrets of a Texas business.

As explained below, Horne is correct that the parties agreed to arbitrate their dispute, which would likely result in a more efficient resolution of claims. But that one factor does not render Texas's exercise of jurisdiction unfair or unreasonable. Because Horne failed to make a "compelling case," the district court did not err in asserting personal jurisdiction.

### III

Having determined that the district court properly exercised jurisdiction over Horne, we must decide whether the case should be dismissed based on forum non conveniens. In the usual forum non conveniens case, the court considers various private- and public-interest factors.[29] In conducting that analysis, a plaintiff's choice of forum is given "significant but non-determinative" weight.[30] However, "[t]he existence of a mandatory,

---

[27] *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 592 (5th Cir. 2014) (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987)).

[28] *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1021 (S.D. Tex. 2018).

[29] *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 766 (5th Cir. 2016).

[30] *Id.* at 767.

enforceable [forum-selection clause] dramatically alters this analysis."[31]  First, we give no weight to the plaintiff's choice of forum and instead require the plaintiff to establish dismissal is unwarranted.[32]  Second, we do not consider the private-interest factors because the parties "waive the right to challenge [the convenience of the] preselected forum."[33]  Accordingly, "the practical result is that forum-selection clauses should control except in unusual cases."[34]  Importantly, this analysis presupposes that the forum-selection clause is valid and that the relevant dispute falls within its scope.[35]

Here, the district court sua sponte raised forum non conveniens.  It then determined that the Agreement contained a valid forum-selection clause and that all of the public-interest factors weighed in favor of dismissal.[36]  "We review the district court's interpretation of the [forum-selection clause] and its assessment of that clause's enforceability *de novo*, then we review for abuse of discretion the court's balancing of the . . . public-interest factors."[37]

## A

As a preliminary matter, the parties briefly discuss what law should apply when interpreting the Agreement and determining its validity.  The district court applied Texas law, stating that "[t]he parties do not dispute that Texas law governs."[38]  But the parties did not, in fact, acquiesce to the application of Texas law.  As such, the district court should have engaged in a

---

[31] *Id.*

[32] *Id.* (citing *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013)).

[33] *Id.* (quoting *Atl. Marine*, 571 U.S. at 64).

[34] *Atl. Marine*, 571 U.S. at 64.

[35] *See id.* at 62 n.5 ("Our analysis presupposes a contractually valid forum-selection clause."); *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016).

[36] *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1024-28 (S.D. Tex. 2018).

[37] *Weber*, 811 F.3d at 768.

[38] *Fintech Fund*, 327 F. Supp. 3d at 1025.

choice-of-law analysis, which in this case dictates that English, not Texas, law should apply.

Though the district court was not sitting in diversity, we still look to state law when determining the validity of a contract in federal question cases.[39] A federal court applying state law generally applies the choice-of-law rules of the forum state.[40] Here, the forum state is Texas. Texas courts look to the Restatement (Second) of Conflict of Laws "[i]n deciding which state's law should govern the construction of contractual rights."[41] The Restatement provides that "[t]he validity of a contract . . . is determined by the law selected by application of the rules of §§ 187 [(Law of the State Chosen by the Parties)]-188 [(Law Governing in Absence of Effective Choice by the Parties)]."[42] Here, the parties chose which law should apply. Thus, we next look to Section 187 of the Restatement,[43] which provides in relevant part:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

---

[39] *See Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016).

[40] *See Weber*, 811 F.3d at 770 ("A federal court sitting in diversity applies the forum state's choice-of-law rules to determine which substantive law will apply." (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941))).

[41] *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 304 (5th Cir. 2016) (alterations in original) (quoting *Maxus Expl. Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991)).

[42] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 200 (AM. LAW INST. 1971).

[43] *See Barnett*, 831 F.3d at 304-05 (noting that Texas courts have adopted Section 187 of the Restatement).

No. 18-20449

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[44]

If this dispute falls under subsection (1), English law applies according to the subsection's terms. If the dispute falls under subsection (2), English law still applies. England has a substantial relationship to the parties—Horne is a U.K. citizen and CrossVerify is registered in the U.K. Moreover, Horne performed services for CrossVerify (and by affiliation, Fintech) in the U.K. Regarding § 187(2)(b), neither party argues that the application of English law is contrary to a fundamental policy of Texas. Further, Texas does not have a "materially greater interest" in the resolution of this suit than England. Though Fintech is a Texas entity, Horne, a U.K. citizen, is accused of stealing confidential information while working for CrossVerify, a U.K. entity. Texas has an equal interest in the resolution of this case as England. Accordingly, we will apply the general rule of enforcing the choice of law provision and analyze the Agreement under English law.[45]

**B**

Fintech argues the forum-selection clause is not valid because it irreconcilably conflicts with another provision in the Agreement—the arbitration provision in Section 12(A). Because they conflict, Fintech argues that the court should strike both provisions and apply Section 12(D)'s fallback provision, which requires the parties to litigate disputes in the federal courts

---

[44] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (AM. LAW INST. 1971).

[45] *See Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 304 (5th Cir. 2016) ("The Supreme Court of Texas has recognized that contractual choice of law provisions should generally be enforced . . . ." (quoting *Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306-07 (5th Cir. 2006))).

in Houston. Section 12(A) requires that "all disputes, controversies or claims arising out of or relating to this Agreement (including for any breach, invalidity or interpretation of this Agreement)" and "any non-contractual obligations arising out of or in connection with this Agreement . . . shall be finally adjudicated by arbitration under the London Court of International Arbitration." Section 14 states that "the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims)."

Under English law, courts should make every attempt to harmonize contractual provisions and should determine that two provisions are irreconcilable only as a "last resort."[46] English law also provides that forum-selection clauses do not inherently conflict with arbitration provisions.[47] For example, in *Paul Smith*, the court reconciled an arbitration provision and a "Language and Law" provision.[48] The arbitration provision stated that "any dispute or difference . . . aris[ing] between the parties . . . shall be adjudicated . . . by one or more Arbitrators."[49] The Language and Law provision stated that the "Courts . . . of England shall have exclusive jurisdiction over [the Agreement]."[50] The court held that the two clauses were reconcilable, and that the second referred to the court that could take interim measures to assist an arbitration (e.g., entering preservation orders or removing an arbitrator for misconduct).[51] The court noted that there was an

---

[46] *See Shell Int'l Petroleum Co. v. Coral Oil Co.* [1999] 1 Lloyd's Rep. 72 (QB) 75-76.

[47] *See Paul Smith Ltd. v. H&S Int'l Holding Inc.* [1991] 2 Lloyd's Rep. 127 (QB) 129-30.

[48] *See id.* at 128-30.

[49] *Id.* at 128.

[50] *Id.* at 128-29.

[51] *Id.* at 129-30.

apparent incongruity between the two clauses.[52]  However, that incongruity "pale[d] into insignificance . . . when compared to the unfortunate consequences of treating the arbitration clause in a non-domestic commercial agreement as pro non scripto."[53]

*Paul Smith* controls here.  *Paul Smith* makes clear that giving a court "exclusive jurisdiction" does not conflict with an arbitration clause.  Like the provision in *Paul Smith*, the forum-selection clause here provides English courts with "exclusive jurisdiction."   Even when a case is submitted to arbitration, the court retains some supervisory jurisdiction.[54]  Accordingly, a dispute or issue can be "settled" under a court's jurisdiction even when submitted to arbitration.  Under *Paul Smith*, the provisions do not conflict.

Moreover, the court's ultimate task in construing a contract "is to ascertain the intention of the parties."[55]  We start with the assumption that "the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered . . . be decided by the same tribunal."[56]  The Agreement itself confirms that assumption.  The parties dedicate six paragraphs in the Agreement to a complex arbitration scheme.  Meanwhile, the forum-selection clause exists in a single paragraph titled "Choice of Law; Jurisdiction and Venue."  "Business common sense" indicates the parties intended to submit their claims to arbitration.[57]  This case

---

[52] *Id.* at 130.

[53] *Id.*

[54] *Id.* ("The law governing the arbitration comprises the rules governing interim measures (e.g. Court orders for the preservation or storage of goods), the rules empowering the exercise by the Court of supportive measures to assist an arbitration which has run into difficulties (e.g. filling a vacancy in the composition of the arbitral tribunal if there is no other mechanism) and the rules providing for the exercise by the Court of its supervisory jurisdiction over arbitrations (e.g. removing an, arbitrator for misconduct).").

[55] *See Shell Int'l Petroleum Co. v. Coral Oil Co.* [1999] 1 Lloyd's Rep. 72 (QB) 75.

[56] *Premium Nafta Prods. Ltd. v. Fili Shipping Co.* [2007] UKHL 40, [13].

[57] *Taylor v. Rive Droite Music Ltd.* [2005] EWCA (Civ) 1300, [2006] EMLR 4 [94].

is not the type of "rare" case that would require us, as a measure of "last resort," to declare these two provisions irreconcilable.[58]  The parties agreed that claims will be submitted to and decided by an arbitration panel.  However, because courts retain jurisdiction to decide interim matters relating to the arbitration,[59] the parties agreed that only the courts of England may decide those interim matters.  We will hold the parties to that Agreement.  Therefore, we agree with the district court that Section 12(A) and Section 14 can be harmonized, albeit for different reasons.

## C

Fintech argues that even if Section 12(A) and Section 14 can be harmonized, Fintech's claims still fall outside of the scope of those provisions. Section 12(A) covers, among other things, "all disputes arising out of or relating to this Agreement" and "any non-contractual obligations arising out of or in connection with this Agreement."  Section 14 covers "any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims)."  Under English law, both arbitration clauses and forum-selection clauses "in . . . international commercial contract[s] should be liberally construed" and "[t]he words 'arising out of' should cover every dispute except a dispute as to whether there was ever a contract at all."[60]  Fintech reasons that because it brings claims under federal law that can stand without relying on the Agreement, the claims fall outside of Section 12(A)'s and Section 14's scope.

Fintech's argument ignores the standard set forth in *Fiona Trust*.  *Fiona Trust* makes clear that we should broadly construe when a claim arises out of

---

[58] *Shell Int'l Petroleum*, [1999] 1 Lloyd's Rep. at 75-76.

[59] *See Paul Smith Ltd. v. H&S Int'l Holding Inc.* [1991] 2 Lloyd's Rep. 127 (QB) 129-30.

[60] *Martinez v. Bloomberg LP*, 740 F.3d 211, 224 (2d Cir. 2014) (second alteration in original) (quoting *Fiona Trust & Holding Corp. v. Privalov* [2007] EWCA (Civ) 20 [18]).

an agreement.[61]  Fintech claims that Horne misappropriated trade secrets and unlawfully used a protected computer to misappropriate confidential information.  Liberally construed, those claims arise out of the Agreement, which was entered into because the "parties desire to have maintained, not disclosed, and used only for the benefit of [CrossVerify] (or its affiliates as the case may be) all such inventions, technology, intellectual property, information and trade secrets."  Accordingly, Fintech's claims are within the scope of the arbitration provision and are subject to a valid forum-selection clause.

Normally, we would also need to decide whether the clause is enforceable under federal law.[62]  However, Fintech does not brief enforceability and thus does not meet its burden to overcome the presumption of enforceability.[63]

## D

Because the district court correctly applied the forum-selection clause, we need only consider whether the district court abused its discretion in applying the public-interest factors.[64]  Those factors include:

> administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.[65]

When dealing with a forum-selection clause, Fintech, as the plaintiff, must show that dismissal is unwarranted.[66]  Fintech fails to make that showing.

---

[61] *Fiona Trust*, [2007] EWCA (Civ) 20 [18].

[62] *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016) (enumerating the factors the court looks to in determining whether a clause is "'unreasonable' under the circumstances" (quoting *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997))).

[63] *See id.*

[64] *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016).

[65] *Id.* at 776 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

[66] *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013).

No. 18-20449

Fintech argues the public factors weigh against dismissal because (1) "[t]here is no evidence that the English courts are any less congested than those in the Southern District of Texas"; (2) "[t]he American judicial system . . . has a substantial interest in ensuring that Americans can, through civil actions, enforce . . . criminal laws and vindicate their rights"; and (3) "it makes little sense to entrust the enforcement of . . . U.S. criminal laws with, or impose the burden of doing so on, the English judicial system."  Fintech's first argument ignores the standard; Fintech bears the burden of proving that dismissal is unwarranted and offers no evidence that the Texas courts are less congested than English courts.  Regarding its second argument, Fintech is correct that "the United States [has] an interest in protecting [its] citizens from abuse by foreign[ers]," but that "manifestly is not the sort of exceptional circumstance that justifies disregarding the parties' agreement on public-interest-factor grounds."[67]  Fintech's third argument, even if true, does not meet the "quite . . . high burden of persuasion"[68] to show that this is an "unusual case[]."[69]  Moreover, English law governs the Agreement.  The English judicial system is thus in a much better position to handle a dispute arising out of the Agreement.

## E

Fintech also argues that the district court reversibly erred by dismissing the case under forum non conveniens without providing Fintech an opportunity to respond.  However, we have upheld a forum non conveniens dismissal despite a lack of notice to the plaintiff because the plaintiff could not "demonstrate prejudice from the error."[70]  The same is true here.  Fintech's

---

[67] *Weber*, 811 F.3d at 776.

[68] *Id.*

[69] *Id.* (quoting *Atl. Marine*, 571 U.S. at 64).

[70] *Moreno v. LG Elecs., USA Inc.*, 800 F.3d 692, 699 (5th Cir. 2015).

No. 18-20449

claims were subject to a valid forum-selection clause, and Fintech cannot show prejudice from its inability to brief the public-interest factors.

*        *        *

For the foregoing reasons, we AFFIRM the judgment of district court.